## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 09-60545-CIV-ZLOCH/ROSENBAUM

R&R INTERNATIONAL, INC.,

      Plaintiff, Counter-Defendant,

vs.

MANZEN, LLC, d/b/a XYIENCE, INC.,

      Defendant/Counter-Plaintiff.

_____/

### <u>ORDER</u>

This matter comes before the Court upon Defendant's Motion to Strike or Exclude Plaintiff's Expert Christopher C. Reynolds and His Report [D.E. 60, 61] upon referral by the Honorable William J. Zloch for disposition [D.E. 111]. The Court held a hearing on August 4, 2010, and heard testimony and the parties' arguments. After careful consideration of the pending Motion, all filings in support thereof and in opposition thereto, the parties' arguments and the testimony presented at the August 4th hearing, and the record in this case, and being otherwise duly advised in the premises, Defendant's Motion to Strike or Exclude Plaintiff's Expert Christopher C. Reynolds and His Report [D.E. 60, 61] is granted in part and denied in part for the reasons set forth below.

### *I. Background*

Plaintiff R&R International, Inc. ("R&R" or "Plaintiff"), is a distribution company that contracted with Defendant Manzen, LLC, or Xyience, Inc. ("Xyience" or "Defendant"), manufacturer of a beverage called "Xyience," to exclusively distribute the Xyience Energy Drink beverages ("Xyience beverage") in Florida, and ultimately in Georgia, allegedly pursuant to a September 8,

2008, Distribution Agreement ("Distribution Agreement").   D.E. 28.   According to the Amended Complaint ("Complaint"), under Count I for breach of contract, Plaintiff asserts that Defendant violated the Distribution Agreement by providing product directly to JP Beverage, instead of allowing all sales to pass through R&R pursuant to the terms of the exclusive Distribution Agreement.   *Id.*   Furthermore, the Complaint states that Defendant admitted that it violated the Agreement, and in an amendment to the Distribution Agreement ("Amendment"), agreed to provide R&R with a credit for every case Xyience sold to JP Beverage.   Plaintiff alleged that Defendant breached the Amendment, and, thus, the Distribution Agreement, by failing to provide those credits to R&R.   *Id.*

Plaintiff also asserts that due to Defendant's alleged breach, Plaintiff lost an advantageous relationship with JP Beverage.   Because JP Beverage distributed product provided by Defendant to numerous sellers, Plaintiff claims it lost substantial profits.   *Id.*   Additionally, the Complaint avers that even though Defendant allegedly failed to provide Plaintiff with appropriate credits, on April 7, 2009, Defendants demanded full payment of past-due invoices and threatened to declare default if R&R failed to pay the past-due amounts.   *Id.*   The Complaint contends that Defendant cannot declare Plaintiff in default for late payments because Plaintiff alleges that the sole remedy for unpaid invoices that the Distribution Agreement authorizes consists of the Defendant's sending of all future shipments of Xyience beverage to Plaintiff cash on delivery ("COD").   *Id.*

In   Count II, the Complaint states that Defendant illegally terminated the Distribution Agreement on April 28, 2009.   *Id.*   According to the allegations, R&R ordered product from Xyience in early 2009, but the parties disputed the amount of the invoice for the shipment.   *Id.*   While the parties were in the process of discussing the amount owed by R&R to Xyience, the Complaint

asserts, Xyience demanded full payment of allegedly inaccurately invoiced amounts from Plaintiff and thereafter terminated the Distribution Agreement.  *Id.*

Plaintiff disputes the accuracy of the invoiced amounts demanded by Plaintiff because Defendant allegedly failed to account for credits of monies owed by Defendant to Plaintiff.  *Id.*  The Complaint's allegations claim that under the Distribution Agreement, Defendant agreed to provide marketing and promotional support but failed to allocate such monies to Plaintiff or alternatively to credit these amounts against the invoices owed by Plaintiff.  *Id.*  In addition, the Complaint continues, Defendant invoiced incorrect prices for products ordered pursuant to the parties' agreements.  *Id.*  Plaintiff further alleges that Defendant failed to provide other agreements in writing regarding the expansion to Georgia of R&R's territory and the promise of the profits of sales from another vendor called Kehe Foods.  *Id.*

As a result of Xyience's termination of the Agreement and its refusal to ship product to Plaintiff, Plaintiff allegedly experienced damages because Plaintiff had held itself out to retailers as an exclusive distributor of Xyience in Florida and Georgia. *Id.*  In its two-count Complaint, Plaintiff seeks a remedy for the alleged breaches of contract by Defendant Xyience and damages for Defendant's alleged illegal termination of the Distribution Agreement, including potential lost profits and sales.  *Id.*

In support of its alleged damages, Plaintiff retained Christopher Reynolds ("Reynolds") of the firm Beverage Development Group, LLC ("BDG"), as an expert, and Reynolds prepared an expert report ("Report").  *See* D.E. 60-4 at 2-18.[1]  According to the Report, Plaintiff retained

---

[1]Some docket entries, including this one, have two page-numbering systems resulting in different page numbers on the same page: the page number of the original document and the page number imprinted across the top of the page by the Court's CM/ECF system.  This Order refers

Reynolds to determine "whether, under industry standards, Xyience . . . had the right to terminate R&R . . .for [g]ood [c]ause under Section 10.1 of the [D]istribution [A]greement[,]and to determine the dollar value of breaching the distribution agreement." D.E. 60-4 at 2. Reynolds detailed in the Report the documents he reviewed to conduct his inquiry, and he set forth his analysis and conclusions. *Id.* at 1-6. Reynolds also attached to his Report (1) three separate charts with the titles "R&R Xyience Valuation [] 4.5 % of FL Markets at $5.50 a case equiv[alent]" [D.E. 60-4 at 8], "4.5 % of GA Markets at $5.50 a case equiv[alent]" [D.E. 60-4 at 9], and "Total GA and FL Markets [] 4.50%" [D.E. 60-4 at 10]; (2) articles appearing in a publication entitled "Beverage Digest" from March 8, 2007, March 12, 2008, and March 30, 2009 [D.E. 60-4 at 11-19]; (3) a copy of report entitled "Zenith Report," dated July, 2009 [D.E. 60-4 at 17]; and (4) the résumé of Reynolds [D.E. 60-4 at 18-19].

In order to calculate damages, Reynolds set forth an analysis of Plaintiff's future lost profits for five years in the future. Reynolds began with a determination of the anticipated duration of future profits, appropriate market share of R&R during the applicable time period, and the potential growth rate of R&R's market share. Relying on the terms of the Distribution Agreement articulated in Section 3, which provides that the contract has a duration of five years, renewable by R&R for successive five-year periods, Reynolds opined that the applicable period for damages calculations was five years. D.E. 60-4 at 4, ¶ D.

Ultimately, Reynolds created two charts – one for R&R's alleged Florida market and the

---

to the page numbers left by the Court's CM/ECF system.

other for R&R International of Georgia's alleged Georgia market.[2]  Each chart was entitled, "4.5%

of [respective state – Florida or Georgia] market at $5.50 a case equiv."  *See* D.E. 60-4 at 8 and 9.

Each chart then contained four columns: (1) reflecting gross profit, distribution cost, marketing, and

net profit for each year; (2) identifying the years from Years 1 through 5 of the projection; (3)

projecting the number of cases sold each of the five years; and (4) estimating the resulting revenue

under gross profit, distribution cost, marketing, and net profit for each of the five years.  *See id.*

According to Reynolds's[3] subsequently filed affidavit, the 4.5% of market share referred to

in the title of each chart applies only to the Year 5 projection, not to earlier years.  *See* D.E. 66-1 at

¶¶ 34-35.  "Market," in turn, refers to the market for non-alcoholic energy drinks in the beverage

market.  *See* D.E. 60-4 at 4.  Reynolds derived the Year 1 sizes of the Florida and Georgia markets

by multiplying the number of energy drinks consumed per person in North America in 2008 (4.2

drinks), according to a publication entitled *Zenith International*, by the populations of Florida and

Georgia, according to Designated Market Area statistics.  *See id.*  For each subsequent year,

Reynolds assumed a 15.1% increase in the size of the energy drink market, based on a *Beverage

World* article from October 2007 predicting that the energy drink segment in the United States would

grow by 15.1% annually from 2008 until 2012.  *Id.*  Reynolds's Report does not attach a copy of this

article.

Reynolds arrived at the 4.5% market share number he projected for Xyience to carry in Year

---

[2]Xyience contends that any losses allegedly experienced by R&R International of Georgia
should not be considered because R&R International of Georgia is a corporate entity separate
from Plaintiff R&R, and it is not a litigant in this case.  The Court need not address this argument
in this Order because the Court finds that Reynolds's Report must be excluded with regard to its
opinions about R&R's lost profits.

[3]*See* William Strunk, Jr., & E.B. White, *The Elements of Style* 13 (4th ed. 1999).

5 by what he described in his Report as "interview[ing] a significant sample of major Xyience distributors" who, in their territories, have market share of between 3.5% and 5.5%.  D.E. 60-4 at 5.  The Report, however, contains no information regarding the identities or any of the characteristics of these "major Xyience distributors," such as where they are located, whether they distribute non-alcoholic beverages exclusively, whether they have comparable operations to those that R&R had, or how long they have been in operation.

To develop the Year 1 number of cases sold, Reynolds apparently took R&R's six months of "unimpeded" operating figures, increased them to account for a 60% rise in sales in the second half of the year due to "seasonality," and added to that result projected sales to 224 Florida and 100 Georgia Amerada Hess stores of three cases per month for the second half of the year and 840 cases that were "transshipped into R&R International's Florida market."  *See* D.E. 60-4 at 5-6.  By engaging in this process, Reynolds estimated that 51,432 cases would have been distributed by R&R in Year 1.  *Id.* at 8.

For each of the following four years, Reynolds estimated that R&R would have distributed 150,000 cases, 320,000 cases, 510,000 cases, and 706,150 cases, respectively.  Other than the fact that Reynolds attested to the fact that the 706,150 cases estimated to be sold by R&R in Year 5 would amount to 4.5% of the market share of energy drinks sold in Florida, the Report does not appear to indicate how Reynolds developed the numbers in the years intervening between 1 and 5, especially because Reynolds emphasized in his subsequently filed affidavit that only Year 5 assumed that R&R held a 4.5% market share.

Reynolds used a $5.50 per case gross profit based on the fact that as of early 2009, R&R purchased 12-pack cases for $10.50 from Xyience and sold them to retailers for $16.00, thus,

6

allowing a gross profit per case of $5.50.  To account for distribution costs, Reynolds conducted a

"sampling of non[-]alcoholic [beverage] distributors." D.E. 60-4 at 5.  Through interviews, he found

that these distributors had an average cost of distribution per case ranging from $1.50 in non-urban,

non-union markets to $2.75 in urban markets and union markets.  *Id.*  Noting that R&R was a "non[-

]urban, non[-]union distributor, Reynolds opined that R&R would have had an average distribution

cost of $2.25 in the "build[-]out stage of the brand years 1-3 and $2.00 [per] case for years 4-5 to

allow for efficiencies." *Id.*  The Report provides no further explanation as to how Reynolds arrived

at these numbers.

As for marketing costs, the Report appears to offer no basis for how Reynolds estimated the

marketing costs that he deducted (along with the distribution costs) from the gross profit to arrive

at the net profit numbers.  *See generally id.*  Additionally, the Report does not appear to address the

fact that in its first months of operation, R&R turned a profit of only about $1,500, and R&R

International of Georgia experienced a loss of nearly $100,000.

In total, Reynolds estimated that, as a result of the alleged breaches of contract committed

by Xyience, R&R suffered lost profits of approximately $8.1 million ($5,521,127 in the Florida

market and $2,652,916 in the Georgia market).  Besides opining on lost profits, Reynolds's report

offered other commentary as well.  Among such statements, Reynolds noted that "[n]on[-]alcoholic

[b]everage [c]ompanies have commanded significant multiple[s] of revenue in recent years," and

further stated,

> Nestle acquired a minority interest in Sweet Leaf Tea in March 2009
> for 4.1X revenue.  Catterton Partners, a private equity firm, invested
> in Sweet Leaf Tea in April 2008 on a 4.9X revenue.  Coke bought a
> minority interest in Honest in February 2008 on a 4.6X revenue.
> Coke's acquisition of Vitamin Water (Glaceau) was 11.5X revenue.

> Based upon a three times multiple of revenue, R&R International
> would have had a valuation in excess of $11 million in 2010 if it had
> been allowed to continue the distribution of Xyience products.

D.E. 60-4 at 4.  During his testimony at the hearing, Reynolds agreed that Sweet Leaf Tea, Honest, and Vitamin Water (Glaceau) are all beverage makers, while R&R International was a beverage distributor.

In his report, Reynolds also represented that R&R sold the Xyience beverage in Tennessee and estimated the gross and net profit that R&R could have received based on Tennessee's population and drink consumption, but indicated that he had not included these net profits in his valuation.  *Id.*, at 6,  ¶ V.  Similarly, Reynolds noted that he had excluded from the valuation R&R's introduction of the Xyience beverages to Kehe Foods, even though he estimated great potential for increased sales and net profits from this avenue for R&R in the future.  *Id.*, at 6,  ¶ W-X.

On the issue of whether under industry standards Xyience had the right to terminate R&R for good cause under the Distribution Agreement, Reynolds determined that R&R "was justified in contesting the amounts of the improper invoices" and that Xyience "violated the contract by transhipping" product into R&R's exclusive territory.  D.E. 60-4 at 6.  In his report, Reynolds also offered that he became aware that Xyience participated in and met with the Anheuser Busch distribution system for Florida in 2008 and 2009 to offer the exclusive distribution of the Xyience brand.  *Id.*  Furthermore, Reynolds contended that due to Defendant's inflated invoice demand amount and provision of "insignificant marketing support after December 2008," Defendant "did not have the right to terminate R&R . . . for [g]ood [c]ause" under the Agreement.  *Id.*

Defendant filed the pending Motion to Strike or Exclude Plaintiff's Expert Christopher C. Reynolds and His Report, and the Declaration of Abran E. Vigil in Support of the Motion.  [D.E. 60,

8

61]. In its Motion, Defendant asserts that Reynolds's Report fails to meet the standards set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and should be stricken, or alternatively, that specific parts of Reynolds's testimony and Report should be excluded. *Id.*

Plaintiff filed its Response in Opposition to Defendant's Motion, accompanied by an Affidavit signed by Reynolds [D.E. 66, 66-1], arguing that Reynolds meets the requirements set forth in *Daubert* for the jury to assess and weigh the credibility of his opinion, and that Defendant's Motion should be denied. Defendant filed its Reply and the Declaration of Abran E. Vigil [D.E. 75, 76], including a Critique of Reynolds's Report prepared by Patrick A. Gaughan, Ph.D., and Henry Fuentes of Ecomatrix Research Associates, Inc.

On August 4, 2010, the Court held a hearing on the Motion. Reynolds testified on direct and cross-examination regarding his qualifications, his written report, and his analysis of R&R's potential lost profits. Both parties also presented closing statements.

During his testimony at the August 4, 2010, hearing, Reynolds admitted that he did not conduct any market surveys and did not identify or sample a random sampling of Xyience consumers in support of his analysis. Instead, over the past five to six years, Reynolds has gone to grocery, gas, and convenience stores where energy drinks are sold and has "looked at the shelves" to "keep up with" what is being sold in different locations. According to Reynolds, this methodology is "not scientific." The Court agrees.

Reynolds further explained that his references to "sampling" of other Xyience distributors in his Report pertained to Reynolds's calling of his contacts and asking them about their experience with Xyience. According to Reynolds, he did not tell these "contacts" that he was asking questions in his capacity as a litigation expert. Some of the distributors Reynolds contacted also distributed

9

alcohol.  Only one company – Victory Beverage, and possibly a second that Reynolds interviewed, were exclusively non-alcoholic drink distributors like R&R.

Although Reynolds opined that alcoholic beverage distributors' distribution costs were analogous to (or higher than) non-alcoholic beverage distributors' costs, he conceded that he devised no methodology to demonstrate the comparability of alcoholic beverage distributors and non-alcoholic beverage distributors.  Moreover, the one certain exclusively non-alcoholic beverage distributor Reynolds interviewed, Victory Beverage, is defunct.

Reynolds further testified that no two markets are exactly the same as each other, so he did not consider differences in locations.  Rather, Reynolds aimed to speak with distributors in a range of markets.  Reynolds acknowledged, however, that he conducted no market studies to determine the strength of the Xyience brand in Florida or anywhere else that would have enabled him to compare the strength of the Xyience brand to other markets where other distributors he interviewed were located.

In addition, Reynolds was impeached on the stand with his deposition testimony.  Although Reynolds disagreed at the hearing that product sampling could constitute a form of marketing under generally accepted principles, in his deposition testimony, Reynolds agreed that product sampling was a form of marketing.  Reynolds further testified in his deposition that he thought that it was a standard procedure for Xyience to provide a free case with other cases, based on what R&R had told him, not based on his own experience, but during the hearing, Reynolds stated just the opposite.

As to Reynolds's factoring into Year 1 sales those cases sold to Amerada Hess, Reynolds admitted that he had not relied on historical sales data for R&R to Amerada Hess.  He also acknowledged having consulted Wikipedia in the forming of his opinions.  More specifically,

Reynolds indicated that on Wikipedia, he found the Goldman Sachs report and the Mintel report cited in his Report.  In addition, Reynolds conceded that the *Zenith International* report did not take into account any effects of the recession because *Zenith International* had relied upon data from 2006 and 2007 in its report.  Finally, Reynolds admitted that he could not have given a recommendation about whether it would have been a good idea to invest in R&R, had Reynolds been offering advice in his prior role in investment banking.

## *II. Analysis*

When a party proffers the testimony of an expert under Rule 702 of the Federal Rules of Evidence, the party offering the expert testimony bears the burden of laying the proper foundation, and that party must demonstrate admissibility by a preponderance of the evidence.  *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).   In making the determination of whether expert testimony and any report prepared by the expert may be admitted, the Court engages in a three-part inquiry of whether (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.  *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)).  The Eleventh Circuit refers to each of these requirements as the "qualifications, "reliability," and "helpfulness" prongs.  *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004); *Quiet Tech. DC-8, Inc. v. Hurel-Dubois, UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). While some overlap exists among these requirements, the court must individually analyze

each concept.  *Id.*

In a district court's analysis under *Daubert*, the court must take on the role of a gatekeeper, but this role "is not intended to supplant the adversary system or the role of the jury."  *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341 (quoting *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001)).  Under this function, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury."  *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).  But "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence."  *Quiet Tech. DC-8, Inc.*, 326 F.3d at1341; *Maiz*, 253 F.3d at 666 (quoting *Alison*, 184 F.3d at 1311).  Thus, the district court cannot exclude an expert because it believes the expert lacks personal credibility.  *Rink*, 400 F.3d at 1293, n.7.  To the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596).

Here, Defendant challenges the expert testimony of Reynolds and his Report on all three prongs of the *Daubert* test.  Accordingly, the Court separately considers each prong.

**A.**     **Reynolds Is Sufficiently Qualified to Testify As An Expert In Valuation of Lost Profits of a Beverage Distributor and In Beverage Industry Standards**

An expert may be qualified "by knowledge, skill, experience, training, or education." *Furmanite Am., Inc. v. T.D. Williamson*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007) (citing Fed. R. Evid. 702).  Moreover, "[a]n expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand."  *Id.* (citing *Maiz*, 253 F.3d at 665).  Where an expert does have congruent experience, "[t]he Committee Note to the 2000 Amendments of Rule 702 . .

. explains that '[n]othing in this amendment is intended to suggest that experience alone ... may not provide a sufficient foundation for expert testimony.'" *Frazier*, 387 F.3d at 1261 (quoting Fed. R. Evid. 702 Advisory Committee's note (2000 amends.)).

Determining whether a witness is qualified to testify as an expert "requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." *Jack v. Glaxo Wellcome, Inc.*, 239 F. Supp. 2d 1308, 1314-16 (N.D. Ga. 2002).  In other words, a district court must consider whether an expert is qualified to testify competently regarding the matters he intends to address.  *City of Tuscaloosa*, 158 F.3d at 562-63.  This inquiry requires an expert to satisfy a relatively low threshold.  *Martinez v. Altec Indus., Inc.*, 2005 WL 1862677, *3 (M.D. Fla. Aug. 3, 2005) (quoting *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999) ("As long as some reasonable indication of qualifications is adduced, . . . qualifications become an issue for the trier of fact rather than for the court in its gate-keeping capacity"), *superseded by rule on other grounds as recognized in Mathis v. Exxon Corp.*, 302 F.3d 448, 459 n.16 (5th Cir. 2002)); *see also Johnson v. Big Lots Stores, Inc.*, 2008 WL 1930681, *14 (E.D. La. Apr. 29, 2008) (summarizing *Rushing*, 185 F.3d at 507 n.10, as "explaining that after an individual satisfies the relatively low threshold for qualification, the depth of one's qualification may be the subject of vigorous cross-examination").  After the district court undertakes a review of all of the relevant issues and an expert's qualifications, the determination regarding qualification to testify rests within the district court's discretion.  *See Berdeaux v. Gamble Alden Life Ins. Co.*, 528 F.2d 987, 990 (5th Cir. 1976).[4]

---

[4]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted as binding all decisions the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

Turning to Defendant's Motion to Strike, the Court has reviewed Reynolds's résumé and Reynolds's Affidavit further detailing his prior experience in the beverage industry, and the Court has also considered the scope of Reynolds's report, as well as the parties' arguments and Reynolds's testimony at the hearing. Based on these considerations, the Court concludes that Reynolds has the appropriate qualifications to testify regarding R&R's future lost profits damages and beverage industry standards.

While Reynolds holds no degree in finance, accounting, or economics, Reynolds's résumé reflects a certificate in corporate finance and substantial professional experience in assessing the future viability of beverage manufacturer and distributor companies for purposes of lending capital. Indeed, Reynolds worked for Morgan Stanley as a financial advisor, where he focused on beverage companies, and he also worked for Merrill Lynch as a beverage specialist.

In these capacities, Reynolds identified prospective beverage clients, assisted these clients, and advised on beverage valuations. During the course of this employment, Reynolds reviewed numerous financial documents, visited many distributors, and served as a liaison between beverage suppliers and banks. Moreover, part of the methodology upon which Reynolds relied in performing these duties included consideration of wholesale agreements. Banks relied on Reynolds's analyses in determining whether to lend money to beverage companies. In developing his position with regard to recommendations about lending money to beverage companies, Reynolds obtained the companies' financials, created spread sheets, projected potential profit calculations, and prepared reports opining as to whether a proposed transaction should be pursued.

Reynolds's prior experience establishes Reynolds's qualification to provide the damage analysis for Plaintiff's future lost profits. Furthermore, the Court determines that his six years of

14

experience working exclusively in the lending industry on transactions involving beverage companies provides an adequate basis for Reynolds to have acquired an understanding of beverage industry standards.   Thus, Reynolds's résumé, Affidavit, and testimony reflect professional experience endowing Reynolds with an appropriate background for serving as an expert in analyzing future lost profits and industry standards.

**B.      Reynolds's Expert Report Must Be Stricken As It Relates to Future Lost Profits Valuation Because It Is Neither Sufficiently Reliable Nor Helpful to the Jury**

### *1.  Reynolds's Report Lacks Reliability*

In determining the reliability of an expert witness, the Court considers such factors as "(1) whether the expert's theory can be tested and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341 (citing *McCorvey*, 298 F.3d at 1256).  These factors, however, are not exhaustive of the different considerations that a court may undertake in its determination of the reliability of an expert opinion under a Rule 702 analysis.  *Id.* (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)).  Among such factors, "[i]n evaluating the reliability of an expert's method . . . a district court may properly consider whether the expert's methodology has been contrived to reach a particular result."  *Rink*, 400 F.3d at 1293 n.7.  The applicability of *Daubert* factors in assessing the reliability in any "given case will depend . . . on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *United States v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005) (quoting *Kumho Tire Co., Ltd.*, 526 U.S. at 150) (internal quotations omitted).

15

Nevertheless, "[p]resenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough" in order to meet a proponent's burden. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, 402 F.3d 1092, 1113 (11th Cir. 2005). Furthermore, "[a]n expert's unexplained assurance that [his] opinions rest on accepted principles fares no better." *Furmanite Am., Inc.*, 506 F. Supp. 2d at 1130 (citing *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005)). Additionally, as *Daubert* requires that an expert testify to scientific knowledge, any conclusions by the expert must be supported by good grounds for every step in the analysis, and if any step is rendered unreliable, the expert's testimony is inadmissible. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d at 1245; *see also Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1344 (11th Cir. 2003) ("[A]n expert's failure to explain the basis for an important inference mandates exclusion of his or her opinion.").

When considering an expert's opinion of damages, as here, a district court must keep in mind that "while damages may not be determined by mere speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference." *Maiz*, 253 F.3d at 666 (quoting *G.M. Brod. & Co., Inc. v. U.S. Home Corp.*, 759 F.2d 1526, 1539 (11th Cir. 1985). "The proof may be indirect and it may include estimates based on assumptions, so long as the assumptions rest on adequate data." *Lehrman v. Gulf Oil. Corp.*, 500 F.2d 659, 668 (5th Cir. 1974).

With these principles in mind, the Court assesses the reliability of the opinions that Reynolds has issued in this case. Under Nevada state law precedent,[5] when a plaintiff seeks relief for a breach

---

[5] The Distribution Agreement provides that Nevada state law governs controversies arising from the Distribution Agreement. *See* D.E. 1 at 17, Section 18.1.

of contract, "lost profits are generally an appropriate measure of damages so long as the evidence provides a basis for determining, with reasonable certainty, what the profits would have been had the contract not been breached." *Eaton v. J. H., Inc.*, 581 P.2d 14, 16-17 ( Nev. 1978).  A plaintiff may recover lost profits if it can show a history of profitability or the actual existence of future contracts from which lost profits can be calculated with reasonable certainty.  *Id.*  The mere fact that the breached agreement related to a new business with no prior history of profits, however, does not bar recovery under a lost profits measure as too speculative, uncertain, or remote.  *Houston Exploration, Inc. v. T.K. Meredith*, 728 P.2d 437, 439 (Nev. 1986); *Gen. Elec. Supply Co. v. Mt. Wheeler Power, Inc.*, 587 P.2d 1312, 1313 (Nev. 1978) (citing *Fireman's Fund Ins. v. Shawcross*, 442 P.2d 907, 912 ( (Nev. 1968)); *see also  Am. Heritage, Inc. v. Nev. Gold & Casino, Inc.*, 259 S.W.3d 816 (Tex. App. 2008) (applying Nevada state law in a breach-of-contract claim).

When projecting future lost profits for a company with limited financial data such as R&R, or what some states may consider a "new business," under Florida state precedent and Eleventh Circuit case law, a party can employ the "yardstick" test by comparing the business whose lost profits the party wants to measure to a similar comparable business.  *See G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1538-39 (11th Cir. 1985) (citing *Lehrman v. Gulf Oil,* 500 F.2d 659, 667 (5th Cir. 1974)); *4 Corners Ins., Inc. v. Sun Publ'ns of Fla., Inc.*, 5 So. 3d 780, 783 (Fla. 2009). Although the Court has not located any cases under Nevada law using the term "yardstick" test, this approach is consistent with the Restatement Second of Contracts, which provides, "If the business is a new one or if it is a speculative one . . . , damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like."  Restatement (Second) of Contracts § 352 cmt. b (2010).

17

Under the "yardstick" test, "the business used as a standard must be as nearly identical to the plaintiff's as possible." *Lehrman,* 500 F.2d at 667. Furthermore, in order to minimize the risk of error, an expert should "[s]elect samples that are truly comparable. To put it another way, care must be taken to be sure that the comparison is one between 'apples and apples' rather than one between 'apples and oranges.'" *Donnelly v. Rhode Island Bd. of Governors for Higher Education*, 929 F. Supp. 583, 591 (D.R.I. 1996). Thus, analysis of "comparable businesses in the area . . . " must guide the measure of damages. *Cates v. Morgan Portable Bldg. Corp.*, 591 F.2d 17, 21 n.7 (7th Cir. 1979). Absent the requisite showing of comparability, a damage forecast for a new business that predicts either the presence or absence of future profits constitutes an impermissibly speculative and conjectural damage calculation. *See e.g., Loeffel Steel Products, Inc.*, 387 F. Supp. 2d at 812 (internal cite omitted).

While, as noted previously, applicable Nevada precedent does not refer to the "yardstick" test by name, the Ninth Circuit Court of Appeals has applied Nevada precedent by looking to other similarly situated businesses as a standard to measure lost profits damages and to meet the "reasonable certainty" requirement of Nevada law. *See El Ranco, Inc. v. First Nat'l Bank of Nev.*, 406 F.2d 1205, 1218 n.18 (9th Cir. 1969) (finding that the comparison of plaintiff's Paris-type revue to other Paris-type revues for a future lost profit analysis provided evidence to the jury to "reasonably ascertain the lost profits."). Furthermore, other state courts follow a similar approach to the "yardstick" test for measuring future lost profit damages of a "new business" by requiring that the anticipated profits be proven with "reasonable certainty," which can include a comparison to a similar comparable business. *See, e.g., Busy Bee, Inc. v. Wachovia Bank, N.A.*, 2006 WL 723487, *29 (Pa. Commw. Ct. Feb. 26, 2006) (citation omitted); *Merion Spring Co. v. Muelles Hnos, Garcia*

18

*Torres, S.A.*, 462 A.2d 686, 696 (Pa. Super. Ct. 1983)) (applying Pennsylvania law*)*; *Kids' Universe v. In2Labs*, 116 Cal. Rptr. 2d 158, 169-70 (Cal. Ct. App. 2002) (applying California law); *Kaech v. Lewis Cty. Public Utility Dist. No. 1*, 23 P.3d 529, 538-39 (Wash. Ct. App. 2001) (citing *Larsen v. Walton Plywood Co.*, 390 P.2d 677 (1964)) (applying Washington law); *Beverly Hills Concepts, Inc. v. Schatz and Schatz*, *Ribicoff and Kotkin*, 717 A.2d 724 (Conn. 1998) (applying Connecticut law); *Given v. Field*, 484 S.E.2d 647, 651 (W. Va. 1997) (applying West Virginia law); *Super Valu Stores, Inc. v. Peterson*, 506 So. 2d 317, 327-32 (Ala. 1987) (applying Alabama law); *Chung v. Kaonohi Ctr.*, 618 P.2d 283 (Haw. 1980), *abrogated on other grounds*, *Francis v. Lee Enters., Inc.*, 971 P.2d 707 (1999) (applying Hawaii law).

In the absence of state precedent, federal courts sitting in diversity must make an "educated guess" as to how the state's highest court would rule. *See Lefrere v. Quezada*, 582 F.3d 1260, 1264 (11th Cir. 2009) (quoting *Benante v. Allstate Ins. Co.*, 477 F.2d 553, 554 (5th Cir. 1973)). As the Nevada state courts have not directly ruled on this issue but have applied the "reasonable certainty" test to future lost profits damages for "new businesses," the Court finds that use of the "yardstick" test is appropriate in this case.

In light of these standards, the Court turns to Defendant's Motion to Strike. The Court has considered the record in this case, the parties' filings, the testimony and the argument presented at the August 4, 2010, hearing, and finds that under the *Daubert* standard, Reynolds's testimony and expert report present an unreliable analysis of R&R's future lost profits. In making this determination, the Court relies primarily on Reynolds's own hearing and deposition testimony regarding the unreliability of his future lost profit analysis.

<u>                    a.  Reynolds's Lack of Endorsement of His Own Work</u>

Significantly, during the August 4th hearing, Reynolds admitted that even though he projected that R&R had potential future lost profits of over $8 million dollars, had he evaluated in his prior positions with Merrill Lynch and Morgan Stanley whether investing in R&R would have been a good idea based on the materials upon which Reynolds relied in developing his proffered opinion, he, himself, could not have offered a recommendation regarding whether to make such an investment. Similarly, in his deposition testimony, Reynolds stated that based on the limited amount of financial information provided by R&R, he could not opine regarding whether a client should invest in R&R, or whether he personally would invest in R&R.  D.E. 75-1 at 29.  Where an expert like Reynolds, who offers himself as an individual who has spent years evaluating businesses like R&R and their future financial viability, is unable to attest to the reliability of his own lost profit analysis, this Court is hard-pressed to reach a different conclusion.  *See, e.g., West Nevada Precious Metals, Corp. v. Sunago*, 2007 WL 710187, *4 (D. Nev. Mar. 5, 2007) (referring to the court's earlier order striking damages expert who prepared profit loss damages because the expert "could not vouch for either the validity or reliability" of the lost profits damages).

Aside from Reynolds's apparent lack of faith in his own analysis, the Court finds that Reynolds failed to employ scientific or otherwise reliable methods to calculate R&R's future lost profits.  As a result, no indication exists that the assumptions underlying Reynolds's lost profits analysis have any validity at all.  More specifically, Reynolds's self-described "sampling" methods, his reliance on what appear to be arbitrarily selected numbers, and his research methods fatally undermine the reliability of his Report and analysis.

b.  Deficiency of "Sampling" Methodology

During the hearing and his deposition testimony, Reynolds admitted that he did not use any scientific method to choose the "sample of major Xyience distributors" on whom Reynolds relied to measure R&R's potential market share or distribution costs for the five-year lost profits projections.  Rather, during his testimony, Reynolds acknowledged that he merely called people with whom he happened to have had pre-existing relationships.  *See* D.E. 75-1 at 22.

Moreover, during his deposition, Reynolds revealed that he was unsure that these distributors constituted "major" Xyience distributors, even though Reynolds's Report described them as such. D.E. 75-1 at 22.  Although Reynolds relied upon these informal conversations as a basis for his market analysis, he did not request any back-up data for the statistics offered by these "sample" distributors to verify their representations.  *See* D.E. 75-1 at 22-23.  Furthermore, during these "off-the-record" conversations with "sample" distributors, Reynolds did not disclose his role as an expert or the purpose of the conversation, thereby further undermining the reliability of the information provided by the distributors.  D.E. 75-1 at 22, 23.

For all practical purposes, Reynolds implicitly admitted that part of the basis for his analysis, his "sampling," could not be tested when he stated that the only way to test the validity of his opinions would be to have his same conversations with this  "sample" of distributor contacts.  *See* D.E. 75-1 at 23.  This does not constitute scientific testing that can be duplicated by another researcher.  As a result, Reynolds's "sampling" methodology significantly detracts from the reliability of Reynolds's opinion.  *See, e.g., Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 387 F.Supp. 2d 794, 811-14 (N.D. Ill. 2005) (rejecting seller's expert on lost profits damage of buyer failed to rely on comparable samples, making his analysis unscientific and unreliable); *BioCore, Inc.*

*v. Khosrowshahi*, 183 F.R.D. 695 (D. Kan. 1998) (striking plaintiff's expert report on lost profits, in part, because expert failed to set forth plaintiff's competitor in the market, did not demonstrate the comparability of plaintiff's product to never-before-marketed product, and did not explain why never-before marketed product's potential sales could serve as a basis for plaintiff's product's future lost sales); *Yapp v. Union Pacific R.Co.* , 301 F. Supp. 2d 1030, 1036-37 (E.D. Mo. 2004) (holding that employer's expert opinion based on survey regarding employer's hiring qualification and processes was not scientific or inherently reliable where survey consisted of employees selected by employer's counsel and study was based on non-random sample of departments and limited jobs); *Menasha Corp. v. News America Marketing In-Store Inc.*, 238 F. Supp. 2d 1024, 1030 (N.D. Ill. 2003) (journalist's survey excluded in part because he failed to gather responses from a sample accurately representing the target population), *aff'd,* 354 F.3d 661 (7th Cir. 2004); *United States v. Mikos*, 2003 WL 22922197, *4 (N.D. Ill. Dec. 9, 2003) (finding that FBI database of bullet samples could not serve as the basis for expert testimony; database could not satisfy *Daubert* requirements where there was no evidence "that the samples were gathered in any approved scientific manner so as to be considered as representative of the bullet population as a whole").

Under the "yardstick" test, sampling choice lies at the heart of an expert's methodology. *See Algood v. General Motors Corp.*, 2006 WL 2669337, *11 (S.D. Ill. Sep. 18, 2006) (citing to *Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 811-14 (N.D. Ill. 2005)) (rejecting expert's opinion in part because he relied on a limited number of samples and he could not justify his sample selection choices). The selection of "sample" distributors by Reynolds based solely on the limited universe of his personal contacts without any reference to R&R or the general characteristics of R&R in order to determine accurately R&R's potential market share, fails to satisfy

22

the "yardstick" test or otherwise comport with an accepted, scientific method of collecting information and weighs against the admissibility of the purported data collected by Reynolds from these so-called "sample" distributors. *Daubert*, 509 U.S. at 593-94.  In order to satisfy the scientific sampling standard, Reynolds's "samples . . .[should have] be[en] chosen using some method that assures the samples are appropriately representative" of the R&R business.  *Algood*, 2006 WL 2669337 at *11.  Here, Reynolds admitted that he did nothing to consider the comparability of the "sample" distributors to R&R.

Likewise, in Reynolds's determination of the average distribution costs, he failed to employ a scientific method of sampling.  According to Reynolds's report, he interviewed  "a sampling of non-alcoholic distributors" in order to determine average distribution costs.  But during the hearing and his deposition testimony, Reynolds admitted that this "sampling" actually included an interview with only one non-alcoholic beverage distributor – and it had since gone out of business.  D.E. 75-1 at 24-25.  The other "distributors" he relied upon as a the basis for his distribution costs analysis consisted of alcoholic beverage distributors, even though R&R is not an alcoholic beverage distributor.  D.E. 75-1 at 24-25.  Nor does Reynolds's Report appear to account for the fact that the only exclusively non-alcoholic beverage distributor he interviewed went out of business, thereby casting doubt on the long-term viability of that distributor and the appropriateness of relying upon information from that distributor to project lost profits five years into the future.

Adding further to the deficiencies, Reynolds's deposition testimony reveals that the distributors he spoke with apparently do not distribute any beverages in the state of Florida or in areas similar to R&R's geographical market.  D.E. 75-1 at 23-24.   More important, Reynolds admitted that he did not rely on any of R&R's own data for the distribution costs calculation, instead

simply selecting an "arbitrary" number for this aspect of the calculations.  D.E. 75-1 at 25-26.

In short, it is clear that in conducting what he described as "sampling," Reynolds failed to compare apples with apples.  Instead, he compared apples with oranges, bananas, raspberries, and rotten apples (Victory Beverage).  For these reasons, Reynolds's analysis does not rest on adequate data and fails to comport with the "yardstick" test.

c.  Reliance on Arbitrary Numbers and Speculation

Nor is Reynolds's analysis otherwise reliable, as Reynolds admits that he merely speculated with regard to fundamental aspects of his lost profits projections.     For example, although Reynolds determined that distribution costs would begin at $2.25 per case for the first three years of the five-year projection period, he randomly selected this number from the range of distribution costs incurred by the distributors he "sampled," a group with corresponding markets that, as discussed above, Reynolds could not testify bore any similarity to the characteristics of R&R's operation or to those of its market.

Compounding the unreliability, Reynolds forecast the distribution cost to decrease to $2.00 per case for the last two years of the projections, but he provided no data or evidence to support this alleged potential efficiency.  To the contrary, during his deposition, Reynolds conceded that the proposed decrease from $2.25 to $2.20 in costs was "arbitrary" and based on no data at all.  D.E. 75-1 at 25.  Put simply, there is nothing scientific or reliable about pure speculation and conjecture.

The Court also finds other problems with the reliability of Reynolds's analysis.  Of significant concern is Reynolds's acknowledgment that he did not really rely upon R&R's actual financial data in the valuation of R&R's potential lost profits.  Interestingly, the financial summary for R&R showed minimal profit, and R&R International of Georgia, Inc., revealed a net loss –

adding the financial data for R&R and R&R International of Georgia, Inc., results in a total net loss

of close to $100,000 – which may have contributed to Reynolds's lack of inclusion of this data in

his analysis.  As Reynolds himself testified, however, the actual financial data of a company, as

limited as it may be, constitutes the starting point for any future-looking financial analysis.

Reynolds's estimations of R&R's projected sales of cases from Years 1 through 5 also lack

support.  In this regard, Reynolds's projections of the number of cases that R&R would sell in Years

2 through 4 in Florida and Georgia appear to be made up completely.   Nor can the Court determine

any foundation for Reynolds's purported conclusions regarding the seasonality of R&R's sales and

the potential for even more growth in the five-year future.  As with the numbers Reynolds derived

through his self-described "sampling," the assumptions described above failed to rest on adequate

data, thereby rendering them unreliable.

### d.  The Unreliability of Reynolds's Other Research Methods

Other calculations and assumptions used by Reynolds are equally troubling.   In the

determination of his conclusions regarding Xyience's contribution to R&R's marketing costs, for

example, Reynolds stated that he relied upon the language of the Distribution Agreement for his

determination that for every $11 of gross profit per case purchased by R&R, Xyience allegedly

committed to spending approximately $9 for marketing.  D.E. 60-4 at 5, ¶ R; D.E. 75-1 at 27.

Assuming, *arguendo,* that Xyience had these per-case marketing cost obligations to R&R,

in Reynolds's determination of  Xyience's alleged required contribution to market costs, Reynolds

entirely failed to account for the fact that Xyience provided one case for free to R&R for every four

cases ordered by R&R.  Although Reynolds himself conceded that product sampling, which is part

of a manufacturer's purpose in providing free cases to a distributor, is a form of marketing, he,

nonetheless, failed to explain why he did not take this factor into account.  D.E. 75-1 at 27-28.

Moreover, while Reynolds purported to support his analysis by relying upon research he found on the Internet website Wikipedia, including the *Zenith International* report, "Beverage World" publications, and "Goldman Sachs" and "Mintel" reports, Reynolds engaged in no efforts to check the reliability of the reports upon which he relied and failed to take into account the peculiarities of the specific alleged geographical markets of R&R's distribution.  From the onset, Reynolds confessed that the reliability of the website "Wikipedia" for scientific sources of information was "mixed," and thus, acknowledged the potential unreliability of relying upon this website as a source for his report.  D.E. 75-1 at 31.  Further, Reynolds stated that although he based his determination of the energy drink market on data from a *Zenith International* report, he did not did not engage in any efforts to check the reliability of the report.  D.E. 75-1 at 30.

Additionally, Reynolds conceded that he relied on *Beverage World* statistics and Mintel reports for determination of the potential growth of the energy drink market, but he did not attempt to review the underlying data or otherwise verify the accuracy of these reports and publications.  D.E. 75-1 at 31.  Likewise, Reynolds's consumption determination also falters.  While Reynolds purported to rely on *Zenith International*, which showed a North America per-individual consumption rate of 4.2 liters, Reynolds gave no consideration to and provided no analysis of how this consumption rate related to the populations of the United States, and Florida and Georgia specifically.  Further, without any articulated basis for his conclusion, Reynolds assumed that consumption of the Xyience beverage would be the same as that of other energy drink products, thereby casting further doubt on his conclusions in this regard although Reynolds's Report.  Under these circumstances, the Court cannot find Reynolds's opinions to constitute "reasonable

26

inferences." *Hudgens*, 328 F.3d at 1344.

Similarly, although Reynolds estimated the population sizes for the states of Florida and Georgia for 2008 as part of his analysis, in fact, reliable data exists for the exact population sizes of these states from the United States Census Bureau. This data reveals Reynolds's gross over-estimations of the populations.

Reynolds's future profit analysis also falls short because he did nothing to determine the strength of the Xyience brand within the Florida market by any scientific method. D.E. 75-1 at 29. Nor did not he perform any sort of study to determine the size of the market for Xyience. Reynolds also did nothing to compare the consumption of an energy drink product in different states, including the states where his "sample" distributors distributed their beverage products, and Florida. D.E. 75-1 at 24.

The Court also finds that Reynolds's conclusion that R&R would be worth $11 million dollars but for Xyience's alleged illegal termination to be based on pure conjecture. Reynolds did not offer any specific data to support his conclusion. In his report, Reynolds compared R&R to Sweet Leaf Tea, Honest, and Vitamin Water (Glaceau). D.E. 60-4 at 4. During his deposition, Reynolds explained that in order to determine R&R's potential acquisition price, he gave a "discount" for R&R's acquisition price as compared with the acquisition prices of Sweet Leaf Tea, Honest, and Vitamin Water, by calculating only three times the multiple of R&R potential valuation for a estimate purchase price. D.E. 75-1 at 33-34.

This aspect of Reynolds's analysis employs a comparison of R&R to beverage manufacturers, even though R&R is a distributor and not a brand manufacturer of any beverage. In estimating R&R's possible acquisition price, Reynolds inaccurately likened R&R, a beverage distributor, to

Sweet Leaf Tea, Honest Tea, and Vitamin Water, beverage brand manufacturers.  Such a comparison by Reynolds constitutes yet another "apples-to-oranges" comparison and, thus, does not rest on adequate data, cannot serve as the basis for valuation, and cannot satisfy the yardstick test.  *See, e.g., Donnelly*, 929 F. Supp. at 591.

Reynolds also did not explain upon what this "discount" was based other than what he described as his own "conservative view" of estimations, nor did he offer any specific data or source of valuation for his determination.  D.E. 75-1 at 33-34.  Adding to the confusion, Reynolds declared that this opinion was not even part of his lost profit analysis but that he had instead provided this information to provide "context" to his lost profit analysis.  *Id.*

The Court appreciates that Reynolds has spent years evaluating companies in the beverage industry and that R&R had limited data upon which to determine potential lost profits.  Lack of data, however, cannot overcome Reynolds's failure under *Daubert* to employ scientific methods or rely on adequate data in performing his future lost profits analysis.  *McClain*, 401 F.3d at 1245; *see also Hudgens*, 328 F.3d at 1344.  Here, Reynolds used methods that amounted to little, if anything, more than speculation and conjecture.  As such, Reynolds's conclusions fail to satisfy the *Daubert* standard.

### 2.  Reynolds's Report Is Not Helpful

According to the Eleventh Circuit, expert testimony is helpful to the trier of fact only "if it concerns matters that are beyond the understanding of the average lay person." *Frazier,* 387 F.3d at 1262; *see also King v. Cessna Aircraft Co.*, 03-CIV-20482, 2010 WL 1980861, *5 (S.D. Fla. May 18, 2010).  Moreover, where an expert opinion has a tendency to confuse the trier of fact, it may not satisfy the helpfulness prong.  *See Frazier*, 387 F.3d at 1258.  Similarly, where an expert's opinion

28

rests on little, if any, data or other scientific basis, it may also fail to qualify as helpful.  *Id.*  Finally, "[b]ecause of the powerful and potentially misleading effect of expert evidence," judges must take care not to allow misleading and prejudicial opinions to influence the finder of fact.  *See id.* at 1263; *see also Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty.*, 402 F.3d 1092, 1111 (11th Cir. 2005) (citing *Frazier*, 387 F.3d at 1263).

The Court finds that Reynolds's lost profits testimony and Report fail to satisfy the helpfulness prong because they rest on inadequate data, may be misleading, and are confusing..  As discussed above, Reynolds's Report is based, in large part, on speculation and conjecture.  Moreover, it contains discussions of matters that appear to relate neither to the lost profits analysis nor the industry standards evaluation.  In this respect, the Court has already mentioned the Report's discussion of the acquisitions of beverage manufacturers Sweet Leaf Tea, Honest Tea, and Vitamin Water in its valuation of R&R at $11 million.  Not only does this discussion involve an apples-to-oranges comparison and pure conjecture as to Reynolds's arrival at the three-times valuation multiple, but it also has nothing to do with Reynolds's conclusion that R&R suffered approximately $8 million in lost profits.  The seemingly random inclusion of this discussion serves to confuse regarding whether Reynolds's opinion values R&R's damages at $8 million or $11 million.

Likewise, Reynolds's discussion of R&R's sales in Tennessee and to Kehe Foods add no value to his lost profits analysis and further obfuscates the objective of his Report.  Reynolds admitted that the inclusion of the potential gross profit and net profit of Tennessee, as well as sales to Kehe Foods did not affect his future lost profit conclusions.  Thus, Reynolds's inclusion of this discussion does nothing other than confuse the trier of fact as to what information Reynolds relied upon in his loss profit analysis.

In sum, the Court finds that the analysis of R&R's potential lost profits provided by Plaintiff's damages expert Reynolds fails to satisfy the "reliability" and "helpfulness" standards set forth under *Daubert*. While Reynolds demonstrated the qualifications to provide a future lost profits analysis, Reynolds's report and testimony are unreliable and will not help the trier of fact. Thus, Reynolds's expert report and testimony regarding future lost profits damages  must be stricken.

**C.   Reynolds's Expert Report Regarding Beverage Industry Standards Satisfies *Daubert* In Part**

       *1.   Some of Reynolds's So-called Beverage Industry Standards Opinions Constitute Impermissible Legal Opinions on Matters Falling Within the Province of the Court*

Next, the Court considers those opinions by Reynolds  offered as part of his knowledge of beverage industry standards, and Defendant's objections that these opinions constitute legal conclusions.  In its Motion to Strike, Defendant objects that the following statements by Reynolds in his Report constitute improper legal conclusions:[6]

    1.    The purpose of the investigation is to determine whether, under industry legal standards, Xyience . . . had the right to terminate R&R . . . for [g]ood [c]ause under Section 10.1 of the . . . [A]greement . . .

    2.    R&R . . . was justified in contesting the amount of the improper invoices and was diligently working to resolve any misunderstandings with Xyience.

    3.    Xyience . . . admitted it breached the Distribution Agreement of September 8[,] 2008[,] Section 4.3 No transhipping and agreed to pay R&R . . . $8.00 a case for all cases shipped into R&R['s] territory.

    4.    There is no mention of a cure period or Xyience's ability to terminate the [Agreement] for alleged non-payment.

---

[6]For ease of discussion, the Court applies numbers to each statement.

5.       Xyience was obligated to spend $2.88 for a 24[-]pack and $1.44 for each 12[-]pack case sold in each market.

6.       In [Reynolds's] opinion, based on industry standards, R&R . . . was justified in contesting the amount of improper invoices and was diligently working to resolve any misunderstandings with Xyience.

7.       []Xyience violated the [Agreement] by transhipping the brand into R&R['s] exclusive market on more than one occasion[,]thus breaking Section 4.3 No Transhipping.

8.       Xyience . . . gave insignificant marketing support after December[,] 2008, which is in contravention of Section 4.2 Cooperative Advertising and Promotions.

9.       Therefore, [Reynolds] . . . believes that Xyience . . . did not have the right to terminate R&R . . [f]or [g]ood [c]ause under Section 10.1 of the . . . Agreement . . . in Xyience's . . . [l]etter of [t]ermination of April 28, 2009.

*See* D.E. 60-4 at 2-5.

Under Nevada state law precedent, which governs the construction of the contract at issue, if the contractual terms of a written agreement are clear, definite, and unambiguous, its interpretation constitutes a matter of law; under such circumstances, a court analyzes the contract without enlightenment from experts. *See Ringle v. Bruton*, 86 P.3d 1032, 1037-38 (Nev. 2004); *Kaldi v. Farmers Ins. Exch.*, 21 P.3d 16, 21 (Nev. 2001); *see also Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.,* 402 F.3d 1092, 1112 n.8 (11th Cir. 2005) (experts are not permitted to offer legal conclusions); *Bagwell v. Fla. Broadband, LLC*, 2005 WL 6163778, *1-2 (S.D. Fla. Mar. 24, 2005)(striking portions of expert testimony that purported to make legal conclusions).

Nevertheless, where a contract is ambiguous, the interpretation of the contract is a factual matter, and expert testimony may be appropriate. *M.C. Multi-Family Devel., LLC v. Crestdale*

31

*Assocs., Ltd.*, 193 P.3d 536, 541, 544 (Nev. 2008); *Ringle*, 86 P.3d at 1037-38; *Kaldi*, 21 P.3d at 21; *see also* Fed. R. Evid. 702. In this respect, expert testimony could be considered admissible parol evidence to determine true intentions of the parties at the time that a contract was written or to resolve a latent ambiguity in the contract, as long as testimony does not vary from or contradict the contract terms. *See M.C. Multi-Family Devel., LLC*, 193 P.3d at 541, 544 (citing *Glenbrook Homeowners Ass'n v. Glenbrook Co.*, 901 P.2d 132, 139 (Nev. 1995)) (finding contract ambiguous and upholding application of parol evidence, including testimony, to explain the ambiguities in the contract); *see also State ex rel. List v. Courtesy Motors,* 590 P.2d 163 (Nev.1979); *See Las Vegas Sands, Inc. v. Culinary Workers Union, Local 226*, 2001 WL 34624048, * 6 n.  4 (D. Nev. Jan 6, 2001) (overruled objection to expert testimony regarding interpretation of a contract term under Fed. R. Evid. 702). In these circumstances, the Court may also look to the facts surrounding the execution of the contract and the subsequent acts or declarations of the parties to interpret unclear contract provisions. *Nevada Refining Co. v. Newton,* 497 P.2d 887, 889 (Nev. 1972); *Holland v. Crummer Corp.*, 368 P.2d 63, 66 (Nev. 1962).

In this case, Opinions 1 and 3 clearly impermissibly infringe on the Court's duty to interpret the law. With regard to Opinion 1, which actually is not an opinion but a statement of Reynolds's view of his expert duties, Reynolds identifies the purpose of the investigation as being "to determine whether, under industry *legal* standards, Xyience . . . had the right to terminate R&R . . . for [g]ood [c]ause under Section 10.1 of the . . . [A]greement." (emphasis added). While an expert may be able to offer an opinion as to whether one party or another acted in compliance with industry standards, an expert cannot permissibly opine on whether a party had a right to do what it did under *legal* standards. Instead, this area is reserved for the Court.

As to Opinion 3, whether certain conduct amounts to an admission of a breach under the law similarly depends on a legal analysis.  Reynolds's efforts to characterize this legal conclusion as a matter on which an expert may appropriately opine must therefore fail.

With regard to these opinions to which Xyience objects, the Court cannot be certain at this time that these proposed opinions are necessarily legal in nature.  As phrased, some of the remaining opinions may opine on whether the parties' actions were consistent with industry standards.  For example, the first halves of Opinions 2 and 6, which suggest that R&R was justified in contesting the amount of the improper invoices may rest on what is generally understood in the industry to involve transshipping or some other underlying term of the contract that has a special meaning in the beverage industry.

Similarly, Opinions 5 and 8 may refer to the generally-understood meaning of particular marketing terms and methods in the beverage industry.  Likewise, Opinion 9 may rest on what is generally viewed as "good cause" in the beverage industry, as opposed to legal "good cause."

Looking to the rest of the "opinions" to which Xyience objects, the second halves of Opinions 2 and 6 appear to encompass nothing more than what the lawyers could argue, based on the evidence adduced at trial.  As such, they are not proper subjects for expert testimony. *See Frazier*, 387 F.3d at 1262 ("expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments").  Similar logic applies to what is described as "Opinion" 4.  That appears to the Court to be nothing more than a factual statement that the lawyers would argue in suggesting that the contract did not allow for Xyience to terminate it.  Consequently, it is also not a proper area for expert testimony.

At this point, the Court cannot determine whether, in fact, all of the remaining opinions

33

necessarily constitute purely legal opinions.  To the extent that they do, they are not permissible.  But to the extent that they actually provide evidence regarding prevailing industry standards and the special meanings of terms employed in the beverage industry, such opinions would be admissible, provided that they otherwise complied with *Daubert* and the Federal Rules of Evidence.  The Court therefore applies a *Daubert* analysis to the remaining opinions.

### 2.  *To the Extent that the Remaining Opinions Actually Constitute Opinions, They Satisfy the Reliability Prong*

"Standards of scientific reliability, such as testability and peer review, do not apply to all forms of expert testimony." *Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC,* 555 F.3d 1331, 1338 (11th Cir. 2009) (citing *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 151 (1999)). When looking at the reliability of  non-scientific expert testimony, "the trial judge must have considerable leeway in deciding . . . whether particular expert testimony is reliable[ ]" and "may decide that nonscientific expert testimony is reliable based upon [the purported expert's] personal knowledge or experience." *Id.* (internal citation omitted).  "A district court's gatekeeper role . . . is not intended to supplant the adversary system or the role of the jury. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech. DC-8. Inc., v. Hurel-Dubois UK Ltd.,* 326 F.3d 1333, 1341 (11th  Cir. 2003) (internal punctuation and citations omitted).

Applying these principles of law, based on Reynolds's background and experience, his opinions regarding beverage industry standards are reliable. Reynolds detailed his practical experience in the beverage industry and established that he is well-versed in beverage industry standards after years of working with and consulting hundreds of manufacturers and distributors.

*See, e.g., Whiteside v. Infinity Cas. Ins. Co.*, 2008 WL 3456508, *8-9 (M. D. Ga. Aug. 8, 2008). Additionally, he has reviewed hundreds of manufacturer and distributor agreements to arrive at his opinions regarding industry standards in the beverage industry. Consequently, in this regard, the Court finds that Reynolds's opinions that truly bear on industry standards and not the law meet the reliability standard.

### 3. *To the Extent That Reynolds's Remaining Opinions Satisfy the Reliability Standard, They Also Meet the Helpfulness Prong*

To the extent that the Agreement is ambiguous and Reynolds's testimony does not contradict the plain language of the Agreement, the Court also finds that Reynolds's testimony and Report may be helpful to the finder of fact in the following ways. First, Reynolds may shed light on how R&R's conduct under the Agreement conformed with beverage industry standards. Further, Reynold may provide an explanation of beverage industry practices and procedures and assist in the meaning of any ambiguous terms as described above. Under these circumstances, Reynolds's remaining opinions that satisfy the reliability standard also meet the helpfulness prong.

### III. *Conclusion*

For the foregoing reasons, Reynolds's testimony and Report regarding lost profit damages is stricken, and certain of his opinions in his testimony and Report regarding beverage industry standards are not stricken at this time, consistent with the analysis set forth above. Thus, Defendant's Motion to Strike or Exclude Plaintiff's Expert Christopher C. Reynolds and His Report

[D.E. 60, 61] is **GRANTED in part and DENIED in part.**

**FILED AND SUBMITTED** at Fort Lauderdale, Florida, this 10th day of September 2010.

ROBIN S. ROSENBAUM
United States Magistrate Judge

cc:     Honorable William J. Zloch
        Counsel of Record